Oral argument not to exceed 15 minutes per side. Mr. Hanley for the defendant appellant. Thank you. May it please the court, counsel for the government, your honor, I'd like to  take three minutes for rebuttal. In my appeal, we raise two issues we'd like this court to consider, both involving orders from the lower court in which involve the fourth amendment. One involves the right of privacy, the other involves the property right. I think before I get into the issues themselves, it is necessary to describe the property in question. It was an apartment complex in Grand Rapids. It sat on a triangular piece of property. On the one side, the views into the apartment complex were blocked by a six-foot privacy fence. On the other side, views were blocked by a story or two of the apartment buildings themselves. On the front, Norman Street, most of Norman Street was blocked from visibility inside with the backs of the carports that existed inside the complex. There was, you could see inside the apartment complex through the driveway. The defendant appellant's apartment sat in the back of the property, some hundred yards or so back, and the carport in question sat a little bit off the center, away from the driveway. Okay, with that in mind, I'd like to take up the first issue related to... Mr. Meshaw, did he have the carport where his vehicles were? There were more than one vehicle, right? Well, I think... Just one vehicle? Well, parked in the carport, yeah. Just one. Did he have the right to use that carport through his lease, or was he just first come, first served who got to use it? It is important to note, and the exhibits reflect this, the carport had the identification number of the apartment number of the apartment that he lived in with his girlfriend. That same number of the apartment was on the carport. Okay, so that was his designated space? The police officer in question testified, if the motion is suppressed, that he did use it frequently. With that in mind, I'll take up the issue relating to the alleged dog sniff. What happened was there was extended surveillance on this property through the use of a pole camera that I'll get to in a minute. And based upon that surveillance, the police decided they would come onto the property and go inside the canine unit around the appellant's vehicle. And they did that, and they had a positive hit based upon that. They went to the magistrate, got a search warrant. It is our position that that search, that is the canine unit, of the canine The issue that this court is faced with to decide this argument is whether or not the carport is curtilage to the property. That is, curtilage to appellant's apartment. This court has adopted the four factor test set forth in the United States v. Dunn to decide these issues. And I would briefly like to address those. The first factor is the proximity of the area claimed to the home. That is, the proximity of the carport to the home. And it is clearly very close, very proximate to the apartment of the appellant. It is testified repeatedly in the motion to suppress it was the closest. How many carports were there? Oh, I don't know. How many? How many? I don't know how many. There was numerous. I can say that. This was the closest one to his front door. And it was a very quick walk from the front door to the carport. So I think that test is... Your position is all the carports are part of the curtilage of each one of the apartments where the car is put in the carport. I'm not necessarily saying that. I may say that if I had looked into where the carports are located, whether they have the identification of the apartment that matched the apartment that the appellant lived in, whether he frequently parked his car there. So I think I would be hesitant to say that about all the carports relating to that being curtilage to all the apartments. Because carports may be a little bit further away than this one was. This one was the most proximate to the apartment we're talking about. So at any rate... How do you distinguish the Coleman case from this one? Well, as I recollect, Coleman involved the situation where an individual pulled into an apartment building or a condominium project and parked his car on a driveway out in the open. There wasn't any carport or anything like that. And so I would distinguish it based upon... It being a driveway versus a carport? Yeah. Yes. The second factor that should be taken into consideration is whether the area is included with an enclosure surrounding the home. Well, this property clearly was enclosed with a whole variety of privacy fences and buildings. In addition to that, the carport itself is closed on three sides. So there was, it seems to me, an enclosure surrounding the home especially. Now the nature of the uses to which the area is put, clearly the carport was used by the appellant to park his vehicle there, as we would expect. The fourth, were any steps taken by the resident to protect the area from observation by people passing by? I would simply say that anybody passing by on Norman Street on the front of the apartment building could hardly see the carport in the back and certainly the entrance of the carport. So there wasn't a concern to that. Was the carport in the pathway for any other residents of the apartment complex to reach their apartment? The carport involved spaces, it seemed to me, to park two or three cars. So I think that probably another resident of the complex would be able to work in that carport. Yes. So there are three spaces in this carport? Don't hold me to that, but I'd say that that's true. And Mr. Mayshaw only used one of the spaces? Yes, that's correct. And that's the one that had his apartment number on it. Is there any evidence in the record of any other resident using any of the other spaces? No. Everything I've seen, all the surveillance showed, no one was using the other parking spots. And I believe you said earlier that his apartment number was somewhere on the carport? That's correct. Was there any other apartment number on the carport? No. So based upon an analysis of the four factors and done, it seems to me that an argument, a strong argument, can be made that this constitutes curtilage and that this search was conducted by the police without a warrant. A warrant that was very easily could have been obtained by the police and wasn't. And therefore, I maintain that the order of the lower court denying that there was a violation of the property rights of the appellant in this case is justified. And I would, of course, point to the Jardines case, which basically held a similar, well, not a similar exact factual basis, but indicated that the police could not conduct a search of curtilage without a warrant. And certainly the police did not have a warrant to conduct one here. Now the second issue that I raised relates to a privacy right. That is, we take issue with the lower court's order finding that the ongoing surveillance of the police that was conducted from a telephone pole in which they attached a camera 20 foot high and had it trained on the front of the appellant's apartment, and it's panned over onto the carport, that that violated the Fourth Amendment's right to privacy. I understand, I am aware of the Houston case that held in similar facts that it was not a violation of the right to privacy. I would point to this distinction in between the two cases. Houston involved a situation where the lower court found that the police officers in question had the very same visibility, could see the same thing from the street as from the pole camera involved in that case. Here, that is not the situation. The case is distinguishable on those grounds. As I point out in my brief, the views from the street, what limited as they are, don't certainly have the same look as a 20 foot high. And you can tell from reviewing the exhibits in the case, certainly you can't have those views from the street. If we were to determine though that the Houston case controlled here and that the surveillance photographs were permissible, wouldn't those photographs give enough evidence to support the warrant to search the house or the apartment ultimately without excising out all the drug sniffing portion? Your Honor, when one reviews the affidavit in this case, it is paper thin. I don't believe that those surveillance photographs provide sufficient probable cause to justify a warrant of any kind. It wasn't until the officers conducted the search of the curtilage that they went and got a warrant. I don't believe that, so my answer to that question is, I don't believe that the affidavit justifies probable cause to obtain a warrant. I see that you're out of time, Counsel. Thank you. Good morning. Good morning. May it please the Court, Counsel? Tanya Long, the United States. In this case, we ask that this Court affirm the District Court's denial of Mr. Mayshaw's motion to suppress. Both the video footage from the poll camera and the dog sniff in this case were not in violation of the Fourth Amendment. I'd like to start with the dog sniff by pointing out that the only issue in that issue is whether this carport area is curtilage. If it is curtilage, then Florida v. Jardines would apply, but it is not curtilage. And so because it's not curtilage, it is essentially an open field. There is no violation of Mr. Mayshaw's right. What evidence is there on the record that others besides Mr. Mayshaw were using this carport? Well, so the carport space itself, so the carport is made up of, this carport is made up of four different spaces. That are enclosed. Four spaces. Yes, four spaces under the same roof. And do you agree only Mr. Mayshaw's apartment number is on the carport? I do not agree with that, no. What is on the carport from the government's perspective? What are you contending? So what's in the record is you can see photographs of the side of the carport, and on the side of the carport closest to where Mr. Mayshaw parked, there is the 4829, which is the number of the apartment building, not his individual unit. Now the officer was asked during the suppression hearing, are there numbers on top of the individual spaces? And he said he did not know. I believe counsel showed him a photograph. It was too hard to make out what the numbers were, but the officer did acknowledge that there appeared to be some number on top of spaces in the carport. But there's nothing in the record that it was his apartment, 104, that was on that space itself. Is there anything in the record as to how many apartments are in this apartment building? No, there is not, although I believe that there is, it's either four or eight that enter through the same entry door, the common door that Mr. Mayshaw was seen entering in and out of. And is that common entry door next to the carport? It is down a short pathway from the carport. You can see it in the government's brief. We have some photographs and you can see on page... Okay, is there any evidence, we'll find it, is there any evidence of anyone other than Mr. Mayshaw using the carport to park a car? The entire carport or that particular space? Any part of the carport. Yes, now I don't have the site here, but there were defense exhibits that were admitted during the suppression hearing. They were later filed, I believe it might be docket entry 119, but I would have to double check for the court. And there's basically the pole camera log is what it was. And so there's a series of just photographs in there. And it does show, I believe, other carport spots being used. I'm not sure if there are any photographs there of the one directly next to Mr. Mayshaw's being used, but there definitely were other spaces in there being used. There's no evidence in the record, though, that anyone besides Mr. Mayshaw was parking in that particular spot. But I wouldn't... Was there anything to partition that spot from the other spots in the carport? Any barrier? There's also a photograph in our brief that shows the view into the carport from the entry area. And you can see that kind of two of the spots are somehow set off a little bit from the other two. So there appears to be that kind of the carport is split in half. There might be poles. I can't tell from the photograph if there's a wall there, but there's two spots that are together and another two spots that are together. They're all under the same roof, and they are not fully enclosed. Is it possible to see his spot from another spot, what's going on in his spot? Yes, Your Honor. Okay. Yes, and you can actually see from the entrance. You can see fully into the spot. And the district court did find that anyone kind of walking their dog in that area could walk right past Mr. Mayshaw's spot. Now, I'm saying Mr. Mayshaw's spot... Is there anything in the record that Mr. Mayshaw had the ability to exclude other people from using the space where his car was? There is nothing in the record, and that should be the defendant's burden to prove that as part of his standing, his reasonable expectation of privacy in that spot. There is nothing in the record that that spot was even assigned to that apartment or that he had any right to park there or to exclude others from parking there. Now, I do not think that that's a dispositive fact, though even if this court were to find that he could exclude others from parking there, what we have is simply a covered parking spot. There is, under the Dunn factors, nothing to indicate that this is curtilage in this case. Now, talking about proximity, we have a walkway, a common door between Mr. Mayshaw's unit and the outside that's shared by others. We have common walkways down past grass to get to the carport, and then that's in a parking area that is open to the public and is common. We also have, for the second factor, there's no enclosure around this spot. It has, as a carport, it provides some shielding of weather, but it's not enclosed, and there's no indication that Mr. Mayshaw had any right to store things there or otherwise bring his life from his apartment out into that spot. It's a roof with some poles holding the roof up. That's correct. There's also, though, on the side closest to him, there is a wall on the side. On the side that's next to his spot? Yes. But there's not a wall anywhere else? No, there does not appear to be a wall anywhere else. So there's no here any indication that he's able to use this spot to, say, store his barbecue grill or to come out and picnic in this spot if he's not parking in it. It's not the same as his backyard. It's not the same even as the Burston case from the Eighth Circuit that the defendant has studied. What's in the record as far as consent from the landlord for the police to be on the property? The record is that the police officers asked the managing company, the person who managed the apartment, that they were given permission. That was both admitted by the officer at the hearing, and there was also an affidavit from the management company that was attached. Is the government contending that the officers had consent from the landlord to go into the carport? There's nothing specific about that in the record. We would not make that representation, no. But our position is that it is no different from any other area within the parking lot. It was all part of the open fields, and there's no reasonable expectation of privacy there to prevent the officers from going inside. I think the final done factor would be the steps to protect from observation. There's simply nothing here that Mr. Mayshaw did to protect this spot from others being able to see it or walk through it. A person getting into the car next to Mr. Mayshaw's in the carport would be able to walk right through his spot, cut through his spot when he's not there, or would walk right in the same path that the officers took the dog to do the sniff in to get into their car. So this is not a curtilage case. This is a reasonable expectation of privacy case. And because this is an open field and not curtilage, there was no Fourth Amendment violation there. If there are no further questions on that issue, I can move to the poll camera. This is a very simple case based on Houston. In Houston, we had a poll camera that could look into the curtilage, and this court found that that was acceptable. There was no Fourth Amendment violation there because it was the same view that could be seen from the street. Here we have even less of an intrusion than there was in Houston because we do not have a camera that is looking into the curtilage. The camera is looking at the parking lot. It's looking at the carports. It's looking at the front door that is the common door, not the door to Mr. Mayshaw's individual unit. The district court did find that it was the same view that could be seen from the street and the parking lot, which again is the open field. The officers were permitted by the open field doctrine to be in the parking lot and to be observing these areas. They also had permission from the landlord to be in the parking lot looking at these areas. In fact, there was other surveillance that took place in the parking lot, and the defendant has not sought to exclude that or object to that. So if the officers could be in the parking lot doing these areas, they were certainly able to put up a camera and view the area. Were the photos alone enough to support the affidavit taking out the dog sniffing evidence? Yes, Your Honor. Why did it take place then? The belt and suspenders approach, Your Honor. Officers are deciding, you know, should we do one more thing before we ask a magistrate judge to approve our warrant? The officer testified at the hearing that the reason that detectives were on site that day was that they were in anticipation of the search warrant. The search warrant was already planned at the time they decided to do the dog sniff. They did it. They had additional evidence to put into their warrant affidavit, but it was not necessary for probable cause in this case. And finally, even if this court did find that there was an error, the good faith doctrine should apply under McLean. This is close enough to the line, the dog sniff, that the officers were not objectively unreasonable in relying on this warrant and seeking this warrant. Here the district court found that this was not curtilage, that there was no fourth amendment violation in the dog sniff, and that is a strong indication that this is close to the line if it's not, as we would assert, on the correct side of the fourth amendment line. So for all of those reasons, we ask this court to affirm the denial of the defendant's suppression motion. Thank you. Thank you very much. Any rebuttals? Thank you. The carports in question were enclosed on three sides. There was a wall on both sides and in the back. The number, as I referred to earlier, was set forth on one wall closest to the apartment complex. And the number is for the apartment complex as a whole, the building as a whole, not his particular apartment, correct? That's right. Now, there are no other numbers visible. Now, I know that with all due respect, the counsel for the United States indicated that there may have been other numbers. She couldn't see them. There wasn't any place to put those numbers because you had the one wall that faced the apartment complex. The other wall was away from the apartment complex, and then above it was just the roof. So I don't believe you can look at the photos themselves. All this talk about people could walk around the car, people could walk, I have to emphasize, the Fourth Amendment right that was held violated in Collins and in Jardines was not the right to privacy. It was a property right. What do you have in the record that this is a property right of Mr. Mae Shaw? Pardon me? What do you have in the record that parking in this slot was a property right of Mae Shaw? Do you have a lease that says he has the exclusive right to use this space? He lived at this unit with the permission. The police were well aware he was living there and used the facilities like any other inhabitant. So he didn't have a lease, but he certainly had the rights of someone who was permitted. But didn't everyone who lived in the apartment complex with that number have the right to use this space that Mr. Mae Shaw was using? I think that in the record that the police indicated he wasn't sure whether that was in fact the case. The record is unclear as to who had the right to use that space, whether it was just Mr. Mae Shaw. Well, what does your client contend? Well, my client maintains, and there's nothing in the record to indicate otherwise, that he was the one who always parked in the same spot. Well, is it your client's position that he parked in one particular space all the time or that he could park in any of the four spaces? He parked in the one spot all the time, and I think that's clear from the record. So the fact that anyone can see, visibility doesn't mean that the Fourth Amendment property right is gone. That's not true. Collins and Jardines typically establish that point. Thank you. Thank you very much, and the case is submitted.